"BERTHA SOLOMON", Petitioner, v. "SAUL SOLOMON", Respondent.*

Domestic Relations Court of the City of New York, Family Court, Bronx County, October 20, 1947.

* The opinion as filed sets forth the true names of all parties but as here published substitutes fictitious names and disguises certain other details, in consonance with the spirit of N. Y. City Dom. Rel. Ct. Act, § 52 (L. 1933, ch. 482).

*Charles E. Murphy, Corporation Counsel (Rose Schneph of* counsel), for petitioner.

° *Marcus Miller* for respondent.

Sicher, J. On December 12, 1946, Justice Diserio entered an order directing respondent to pay into this court the sum of $12 each week towards petitioner's support, until further order of this court.

Under such formal order he indorsed: " On means basis "; thereby indicating that he adjudged the petitioner wife entitled to support " according to respondent's means and station in life " (*Harding* v. *Harding,* 203 App. Div. 721, affd. 236 N. Y. 514; cf. *Garlock* v. *Garlock,* 279 N. Y. 337, 340) and that respondent was chargeable accordingly rather than merely with the minimal obligation of a husband to indemnify the community against his wife's becoming a public charge (see N. Y. City Dom. Rel. Ct. Act, § 92, subd. [1], and Family Court Division rule XIII, subd. [d]).

From the petition and the probation bureau investigation report presented to the court pursuant to the Domestic Relations Court Act (§ 121) for guidance in the making of the aforesaid order, it appears that the parties had married in New York City on February 12, 1933; that their union was childless; that respondent left petitioner in November, 1946, and has spurned her pleas for reconciliation; that out of her earnings of $35 a week petitioner had contributed toward the household maintenance expenses while respondent made deposits in a joint bank account; that the $12 a week order sum was small in proportion to respondent's earnings; and that there is also apposite the principle that a wife's " earnings are only one of the ' circumstances of the respective parties ' to which the court gives ' due regard ' under subdivision 1 of section 92 of the Domestic Relations Court Act. To a wife lacking all other income the husband may be required to contribute a larger amount than to one who is partly or even wholly self-supporting. But it does not follow that a wife's ability and self-respect in pursuing gainful occupation necessarily deprive her entirely of the support contribution which would be accorded to her if too unenergetic or inefficient to be a wage-earner. Save in a case where the wife's misconduct has reduced the husband's support obligation to one of indemnifying the community against her maintenance as a public charge, he may not claim exemption solely because the wife has made herself economically useful and is improving her scale of living or laying by for a

rainy day." (" *Walton* " v. " *Walton* ", 180 Misc. 746, 747–748.)

On August 22, 1947, Justice MULHOLLAND ordered respondent to discharge on or before September 2, 1947, the full amount of arrears of $48 then accrued under said December 12, 1946, order, and adjourned to September 2, 1947, for separate hearing, petitioner's application for a modification of that order to add provision for necessary medical attention, namely, an operation for fibroid tumor of the uterus and incidental hospitalization and convalescent care, at a total estimated cost of $500.

When petitioner first presented a July 24, 1947, letter to that effect from her doctor " J. D. F. ", she proposed that the necessary moneys be drawn out of the joint account balance of $1,211.05 in " X " Bank by draft bearing the required signatures of both herself and respondent and leaving the residue intact, subject to future disposition. Respondent, in turn, claiming that such joint account represented *in part* his property, made an unacceptable counteroffer that the account be first evenly divided and that the whole cost of petitioner's medical needs as well as the aforesaid $48 arrears be borne out of *her* half.

This court has no personal or real property jurisdiction and is therefore without power to determine whether the particular facts suffice to overcome the statutory presumption (Banking Law, § 239) of equal one-half ownership of a joint bank account during the lives of both parties and the vesting of the whole in their survivor on the death of the other. But it is not unlikely that the probation bureau of this court would have effected a compromise agreement covering such bank account except for the intervention of counsel whom respondent retained to seek a Supreme Court judgment of annulment of the marriage and who endeavored to turn the proceeding in this court into a preliminary skirmish for such contemplated annulment action. For, despite respondent's previous admission that the joint account represented only in part moneys of his, counsel took the position that such account was respondent's *sole* property and that the whole cost of the operation should be financed by petitioner without contribution from respondent, despite his expressly conceded financial ability to furnish the necessary funds.

Two full hearings were conducted, supplemented by probation officer Carfora's investigation report of data — stipulated to be considered by the court in reaching its decision — concerning what, if any, sums for hospitalization and sick benefits petitioner might be entitled to as a member of her union.

Obviously, there is here applicable the doctrine that " where truth hangs upon the credibility of witnesses, courts should consider the advantages of the trial court who has seen and heard the witnesses " (*Smith* v. *Smith,* 273 N. Y. 380, 383) — a doctrine especially pertinent to matrimonial litigation (*McKee* v. *McKee,* 267 N. Y. 96, 100), as is also the cognate principle that " the demeanor of a witness on the stand may always be considered in an estimation of his credibility, and demeanor is always assumed to be in evidence " (*Rains* v. *Rains,* syllabus of court in 17 N. J. Misc. 310, revd. on other grounds 127 N. J. Eq. 328).

From the demeanor of the parties and the oral and documentary evidence the inference is inescapable that petitioner is still in love with respondent; that he is a self-centered, evasive individual who, having tired of his ailing wife and wishing to be free of her, is coldly unsympathetic toward her natural and proper wish to undergo another serious operation only at the hands of a surgeon who had previously operated on her and upon whose skill and interest she relies in facing another surgical ordeal.

On respondent's attorney's insistence Dr. " J. D. F." attended as a witness and, with petitioner's express consent, testified as to her past and present physical condition.

His qualifications as physician and surgeon were expressly conceded.

He testified that in 1941 he had removed one of petitioner's Fallopian tubes; that in the latter part of December, 1946, his examination of petitioner disclosed a mass on her uterus, that upon a second examination in July, 1947, he found that it had grown to the size of a grapefruit; that the sooner such a growth is removed, the better; that the reasonable cost of his services as surgeon in performing the requisite operation and postoperative care while petitioner remained in the hospital would be $250, and in addition $5 for each subsequent visit at his office; that because she had developed pneumonia after the 1941 operation he was of the opinion that she would need to remain in the hospital at least two weeks after the contemplated tumor operation and would then require another month's convalescent care at home before returning to work; that he planned to perform the operation at " X " Hospital, where there would be a charge of $25 to $35 for the operating room, an anaesthetist's charge of from $20 to $30, a charge of at least $6, and perhaps $7, a day for a bed in a ward of four or five patients, or $9 a day in a semiprivate room; that there would be also a minimum

charge of $15 for medicine in the absence of complications but more if, for example, penicillin became necessary.

Cross-examination brought out the Dr. " J. D. F.'s " diagnosis had been confirmed by another (named) specialist; that although the operation was not emergent, delay was inadvisable; that while this is the kind of operation which could be, and is, performed in public hospital wards, the patient there would have no voice in the choice of the surgeon and might be operated on by a student interne as part of his medical training instead of by a visiting or resident surgeon; that there is always danger of an embolism and the consequent advisability of having an experienced surgeon in charge of the case, and that public hospitals also expect patients to pay in accordance with their means.

On the whole record (including the demeanor of the parties) the court hereby overrules the respondent's objections (as stated in the brief in his behalf) that " there is no absolute need for the operation "; that " the operation can be performed with a minimum of expense and with just as good a result, in a city hospital "; that " petitioner's circumstances are such that by reason of hospitalization benefits and her own independent income she can defray the expenses of the operation by herself " and " the petitioner is not in good faith and is attempting to impose upon and deceive this Court ".

On the contrary, this court finds that respondent is heartlessly undutiful to an ailing wife whom he is maneuvering to cast off for his own selfish ends; that the account he opened in " Y " Trust Company on September 3, 1946 (subsequent to the June 4, 1946, final deposit in the aforesaid " X " Bank joint bank account opened on February 3, 1946) is *his* property, and that the $1,103.09 balance in that account belongs to him and is available to him.

Patently, respondent's fantastic testimony concerning the said " Y " Trust Company account need not be accepted as conclusive merely because no other witness contradicted it. " * * * the mere assertion of any witness does not of itself need to be believed, even if he is unimpeached in any manner, because to require such belief would be to give a quantitative and impersonal measure to testimony." (7 Wigmore on Evidence [3d ed.], § 2034, subd. [3], pp. 260, 261. See, also, 64 C. J., Trial, § 1019, pp. 1209–10; 1 Chamberlayne, Modern Law of Evidence, § 262, p. 313; and The Uncontradicted Testimony of an Interested Witness, 20 Cornell L. Q. 33.) " If everything or anything had to be believed in court simply because there is no witness to contradict it, the administration

of justice would be a pitiable affair." (GAYNOR, J., in *Punsky* v. *City of New York,* 129 App. Div. 558, 559; accord, *Dodge* v. *Dodge,* 64 N. Y. S. 2d 264, affd. 270 App. Div. 1025.)

For reasons set forth in a prior opinion (*" Murray "* v. *" Murray ",* 47 N. Y. S. 2d 837) the court also finds that it has the discretionary power to make the modifying order which is being entered upon the filing of this decision.

True, if the $12 a week ordered sum had been fixed instead by a judgment of divorce, such allowance would constitute a limitation upon any demand for reimbursement of *past* expenditures for medical attention (see *Karminski* ·. *Karminski,* 260 App. Div. 491). But, apart from the fact that we are here dealing with contemplated, not past, expenditures, " such rigid comprehensiveness does not attach to a support order of this Court of limited jurisdiction and summary procedure. Every such support order assumes that the marriage relationship still continues; even when the spouses are living apart, it does not constitute an adjudication of the wife's right to separate maintenance; and it is more flexible than a final alimony judgment. Such lesser status of a Family Court support order, as distinguished from a Supreme Court judgment of divorce or separation, is reflected both in the Servicemen's Dependents Allowance Act of 1942, as amended, 37 U. S. C. A., § 201 *et seq.,* and the Internal Revenue Code, as amended. For, § 6, subd. c of the former statute expressly imposes the amount of alimony or maintenance in a judgment of divorce or separation as a limitation on the dependents' allotments, but no such limitation arises from a support order of the kind entered in this Court. Similarly, the provision in § 22(k) of the Internal Revenue Code, 26 U. S. C. A., Int. Rev. Code § 22(k) (added by § 120(a) of the Federal Revenue Act of 1942), whereby, for the first time, a wife became liable for Federal income tax upon alimony and a husband to credit for alimony payments, expressly applies only to a couple who have been legally divorced or separated but not to the support order payments of a husband who is living apart from his wife without judicial decree. Moreover, the whole tenor of §§ 92 and 101 of Domestic Relations Court Act is to empower the Family Court summarily to order such varying sums as from time to time may be reasonably required for *all* the changing support needs of dependents and consistent with the changing financial ability of the person chargeable with their support. So, subd. 2 of Domestic Relations Court Act, § 92 seems fairly susceptible of the construction that it may be invoked to provide for the medical care of a wife

or child or other dependent, whether prospective or past, and thereby avoid the expense and circuity of a money action by the physician or hospital or petitioner against respondent in another court." (" Murray " v. " Murray ", 47 N. Y. S. 2d 837, 840, 841.)

It remains only to consider the amount respondent should be ordered to contribute after taking into account the benefits to which petitioner might be entitled as employee of a union shop.

The limited extent of such benefits was ascertained after not only an inquiry letter from probation officer Carfora to a duly accredited agent of petitioner's union but, by the court's direction, a personal interview between probation officer Carfora and said union representative. And the facts are so involved as to satisfy the court that petitioner did not attempt, as respondent's counsel argues, to deceive by hiding the existence of any such benefits but, on the contrary, she did not understand what they were.

The net of the situation as to the petitioner's union benefits is the following:

Petitioner's shop is not covered by the union plan but only by employers' group insurance, under which the petitioner is entitled to only:

(a) $5 a day while in the hospital, not to exceed thirty-one days;

(b) $25 for miscellaneous expenses, such as X-ray, anaesthetist, laboratory, operating room, drugs, dressings, etc.;

(c) No allowance whatever for payment of surgeon's fees;

(d) Based on petitioner's earnings, $18 each week while disabled, beginning eight days after the first day of disability and ending when petitioner returns to work (not exceeding a maximum disability period of thirteen weeks);

(e) A $1,000 life insurance policy, the premiums of which are paid by the employer;

(f) Petitioner may choose her own doctor and hospital.

Thus, it appears that the total contribution which petitioner can collect from her employer is an estimated amount of (a) $75 for fifteen days at the hospital and $25 for miscellaneous expenses there, i.e., a total of $100, and (b) sick benefits during her convalescent period, when she is not working, of $18 a week.

The following is the adjudication of petitioner's medical attention needs:

Two hundred fifty dollars for the operation and $25 for office visits thereafter; $105 for fifteen days at the hospital, at $7 a day; $30 for anaesthetist; $35 for operating room; $35 for

medication; that is, a total of $480, of which $100 appears to be collectible under the insurance policy provided by petitioner's employer, leaving a balance of $380 to be covered by this court's order.

The December 12, 1946, order is therefore modified *nunc pro tunc* as of September 9, 1947, to direct respondent to deposit into this court, until further order of this court:

(a) The original order sum of $12 per week (hereby continued), each and every Monday, as heretofore directed;

(b) *In addition,* the sum of $380, for the aforesaid medical attention needs of petitioner, in full by noon of October 22, 1947, or, if respondent so elect, and to avoid any possible question of conflict with subdivision (3) of section 92 of the Domestic Relations Court Act (see " *Cannon* " v. " *Cannon* ", 190 Misc. 677), in installments of $38 on Monday of each week, reckoning from and beginning as of September 15, 1947 (the first Monday after the September 9, 1947, hearing).

Said $12 per week deposits shall be remitted to petitioner by the Support Bureau immediately on receipt in accordance with the customary practice.

The said additional amounts, in the aggregate of $380, shall be paid to petitioner, or, for her account, to Dr. " J.D.F." or to the " X " Hospital, for application toward the aforesaid surgical, hospitalization and other medical attention charges.

If the whole of said $380 be not needed for the specific purposes above stated, any excess balance shall either be retained by the Support Bureau in the absence of request by petitioner or by Dr. " J.D.F." or the " X " Hospital, subject to further order of this court, or, if paid over to petitioner or for her use and not actually used, shall be the subject of reimbursement as a credit to respondent for any such overpayment.

If more than $380 be needed, an application therefor may be made by petitioner on notice to respondent.

It is earnestly urged that respondent deposit the entire amount of $380 immediately so that there may be no delay in the performance of the operation.

In case of default a substantial bond is indicated.

Notify parties and attorneys in accordance with the subjoined direction.